UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
LYNETTE JOHNSON on behalf of I.M., a minor

Plaintiff,

-against-

CAROLYN W. COLVIN,
Commissioner of Social Security,

Defendant.
-------------------------------------------------------x

**MEMORANDUM and ORDER**

14-CV-6521 (SLT)

**TOWNES, United States District Judge:**

Lynette Johnson ("Plaintiff") seeks review of a final decision of the Commissioner of

Social Security (the "Commissioner"), denying Plaintiff's application for Supplemental Security

Income ("SSI") filed on behalf of her minor child, I.M. The parties have filed cross-motions for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons

set forth below, it is **ORDERED** that the Commissioner's motion (ECF No. 14) is **DENIED,**

Plaintiff's motion (ECF No. 18) is **GRANTED in part**, and the case is **REMANDED** for further

proceedings consistent with this opinion. The Clerk of Court is respectfully directed to enter

judgment and close the case.

I. BACKGROUND

A. Procedural History

On or about December 13, 2010, Plaintiff filed an SSI application on behalf of I.M., her

daughter, who was then nine years old. (Administrative Record ("A.R.") at 212-17). Plaintiff

indicated that her daughter had been disabled since May 1, 2009, due to attention deficit

hyperactivity disorder ("ADHD"), mood disorder, and eczema. (See A.R. at 212, 268). The

Commissioner denied the application on May 3, 2011 (A.R. at 129-35), and Plaintiff timely

sought an administrative hearing (A.R. at 137-39). The hearing was held before an

Administrative Law Judge ("ALJ") on March 28, 2013. Plaintiff was represented by her current

counsel and both she and her daughter testified. (A.R. at 104-28). The ALJ denied the

1

application on April 5, 2013, finding that I.M.'s ADHD was her only "severe impairment" and the limitations it imposed on her relevant capacities were not the functional equivalent of impairments under 20 C.F.R. sections 416.924 and 926a. (A.R. at 104-28). Plaintiff's counsel then timely requested Appeals Council review of that decision and later submitted to that body additional records stemming from I.M.'s subsequent six-month inpatient treatment at a psychiatric ward. (A.R. at 80-81, 299-302, 304). The Appeals Council denied review on September 10, 2014, refusing to consider the new records on the grounds that they "were about a later time" subsequent to the ALJ's decision and therefore "d[id] not affect the decision about whether [I.M. was] disabled beginning on or before April 5, 2013." (A.R. at 1-5). Plaintiff then initiated this suit on November 5, 2014, seeking judicial review of the Commissioner's decision "and judgment for such relief as may be proper, including costs." (ECF. No. 1 at 3).

B. Factual and Medical Background Before the ALJ

The earliest records concerning I.M.'s condition stem from her March 2010 Individualized Education Program ("IEP") evaluation performed by the New York City Board of Education. (A.R. 229-54). She was then eight years old and in the third grade at P.S. 69 and had not previously received special services at school. (A.R. at 229, 231). The IEP indicated that I.M. then received "at risk counseling" and a "teacher report" indicated that she did not complete her work or follow classroom rules, that she "calls out and gets out of her seat throughout the day," that "she gets angry easily if she does not want to do what the teacher asks her to do . . . [and] is never prepared for school and is very disorganized." (A.R. at 231-33). It is also stated that "[I.M.] distracts the other students by singing and making silly noises out loud during a lesson." (A.R. at 231). I.M.'s language skills, "informally assessed," were deemed adequate. (A.R. 231). Through "previous testing" she had been found to function "in the average range of intelligence," deemed capable of performing well in school but hampered by "significant emotional factors" that appeared to interfere with her "level of attention and her ability to reach her academic potential in the classroom." (A.R. at 231). An accompanying

2

Psycho-Educational Report ("PER"), completed by a certified school psychologist, stated that I.M. had a Full Scale IQ falling in the average range of intellectual functioning. (A.R. at 247). In specific areas involving reading, writing, and math she scored in ranges at or below her grade level, often in the lower percentiles. (A.R. at 246-48; 251-53).

In an evaluation of her social/emotional performance, the IEP documentation and PER cited her ADHD diagnosis, her "great . . . difficulty [in] controlling her impulses," and her limited concentration and ability to relate to others." (A.R. at 233, 248-49). Her "impulsive characteristics and moods swings [sic] tend to result in inappropriate behavior in the classroom." (A.R. at 233). Interviews revealed:

> a youngster with significant emotional concerns. [I.M.] appears to be experiencing an enormous amount of underlying anger and aggression. She feels picked upon and victimized . . . and defends against these perceived threats with, at times, physical retaliation . . . [I.M.] required a significant amount of redirection and refocusing during the evaluation. She shuts down and refuses to complete tasks she perceives as difficult [and lacks] the appropriate coping mechanisms and skills to control her impulses and develop positive relationships with her peers.

(A.R. at 233). The IEP further described her "significant emotional issues which interfere with her ability to . . . attend and cooperate." (A.R. at 243). "She is easily distracted and unable to focus . . . for more than a few minutes at a time," can be "rude and disrespectful to adults," and has been known to throw herself on the floor, or throw objects in the Classroom." (A.R. at 243). At that point in time, she was "not producing any work in class and refuse[d] to work with any of the other children" in her class. (A.R. at 243).

The IEP concluded with a "Classification of Disability: Emotional Disturbance" (A.R. at 229), espoused the view that with special programs she could eventually perform well in school, (A.R. at 246-47), and outlined several goals concerning her interpersonal skills, tolerance, self-control, and academic performance, (A.R. at 236-38). It prescribed a 12:1:1 staffing ratio in light of her "significant social/emotional issues" (A.R. at 241-42). I.M. would be permitted to

3

participate in "all school activities" but would receive counseling one-on-one once a week and within a group of three once a week. (A.R. at 240).

As discussed in testimony before the ALJ, and as detailed by documentation in the record both before and after the hearing before the ALJ, I.M was placed in foster care shortly after her March 2010 IEP evaluation and remained there for approximately five months. (A.R at 52, 124-25, 362). The placement took place after I.M. had told her teacher that her mother hit her and after Plaintiff missed an appointment with I.M.'s neurologist and urologist. (A.R. at 52, 322, 356, 362). While I.M. was removed from Plaintiff's home, her two siblings were not. (A.R. at 52). Her father was offered custody upon her discharge, but refrained in light of his work schedule requiring travel away from home. (A.R. at 52). According to various documents in the record, the New York State Office of Children and Family Services (NY-OCFS) eventually returned her to Plaintiff's care after determining I.M.'s claim of abuse was "unfounded." (A.R. at 67). According to records from the Jewish Board of Family and Children's Services, where I.M. would later be treated, the NY-OCFS had previously been "involved 4-5 other times for allegations of physical abuse and neglected [sic]. Mother reports that allegations were unfounded." (A.R. at 348).

While in foster care throughout 2010, I.M. received psychiatric treatment from the Seaman's Society for Children. (A.R. at 309-11). Although the treating physician records from that treatment are not available, an NY-OCFS form summarizes diagnoses made at the Seaman's Society for ADHD, "Mood Disorder, not otherwise specified," and "Night Tremors." (A.R. at 308-11). The form also notes an initial assessment of "Adjustment Disorder [w]ith Anxiety" and "Oppositional Defiant Disorder." (A.R. at 311). Her last visit with the Seaman's society was on November 20, for a routine checkup, before her discharge. (A.R. at 309). Shortly afterwards, a neurologist of unknown affiliation changed her ADHD medication to Adderall and scheduled a reevaluation for the following month. (A.R. at 319). There does not appear to be any record concerning that reevaluation or further treatment by that neurologist.

Plaintiff applied for SSI benefits on behalf of I.M. shortly after her return from foster care in December 2010. In a questionnaire she completed around that time, Plaintiff indicated that I.M. had behavioral issues that prohibited her from socializing, handling her own physical hygiene, and was otherwise limited in her ability to "pay attention and stick with a task." (A.R. at 261-63). She listed "D Amphetamine" as medication prescribed for ADHD, along with medications for allergies and Eczema not at issue here. (A.R. at 269). In answering "yes/no" questions in the "Function Report" form required in the SSI application, Plaintiff indicated that I.M.'s physical abilities were not limited but that she was limited in reading, writing, and understanding money. (A.R.at 259). She also indicated that I.M. was not limited in her ability to identify letters, read simple words, write elementary sentences, basic addition, or telling time and date. (A.R. at 259). She also responded to questions indicating that I.M.'s impairment limited her behavior with other people and prevented her from having friends her own age, from making friends, from getting along with adults or teachers, and from playing team sports. (A.R. at 261).

With regard to helping herself and cooperating with others in taking care of personal needs, Plaintiff indicated that I.M. could not use zippers, bathe or shower without help, brush her teeth, comb her hair, dress herself, clean up after herself, obey safety rules, get to school on time, or accept criticism or correction. (A.R. at 262). Other responses nevertheless indicated that I.M. was able to button her clothes, use a fork and knife, and "help around the house" in a general manner. (A.R. at 262). Regarding I.M.'s ability to "pay attention and stick to a task," she indicated her daughter could not keep busy on her own or finish tasks, chores, or homework. (A.R. at 263). Plaintiff's application ends with notes summarizing that:

> MOTHER ALLEGES THAT CHILD HAS A BEHAVIOR PROBLEM.
> WHEN SHE DOES NOT GET HER WAY SHE THROWS THINGS
> AND SCREAMS . . . MOTHER ALLEGES THAT SHE SCREAMS
> ALL NIGHT. . . IT IS VERY DIFFICULT GETTING CHILD UP
> EACH MORNING.

(A.R. at 263).

By February of 2011, I.M. attended P.S. 18. A teacher from that school provided an unsigned New York State Office of Temporary and Disability Assistance "Teacher Questionnaire" form dated March 3, 2011. (A.R. at 274-84). Based on approximately one month with I.M., her teacher rated her grade level as 4.0 in reading, 2.0 in math, and 3.5 in written language. (A.R. at 274). The teacher also noted that an "unusual degree of absenteeism" ("about 2 times per week") (A.R. at 274, 280), rated as "slight problem[s]" numerous academic and acquisitive capacities (A.R. at 275), noted "obvious problem[s]" relating to focus (A.R. at 276), noted "serious problem[s]" with completing assignments and distracting others (A.R. at 276), and reported that I.M. "needs to be refocused constantly [and] reminded to stop humming." (A.R. at 276). In the domain concerning "attending and completing tasks," the teacher noted slight problems with carrying out simple and multi-step instructions and waiting to take turns; "obvious" problems with paying attention, sustaining attention during play/sports, focusing enough to finish assigned activity or task, refocusing to task, organizing her own things or school materials, and completing work accurately without careless mistakes; and "serious" problems completing class/homework assignments, working without distracting herself or others, and working at a reasonable pace/finishing on time.(A.R. at 276). Regarding self-care, the teacher indicated slight problems with personal hygiene, caring for physical needs, and identifying and appropriately asserting emotional needs; and obvious problems with frustration, patience, responding to changes in mood, use of coping skills, and knowing when to ask for help. (A.R. at 279).

I.M. has also received psychiatric treatment through the Jewish Board of Family and Children's Services ("JBFCS") for roughly a year and a half (A.R. at 362-414). The record regarding her treatment there is sparse, and mostly consists of an initial intake assessment dated March 14, 2011, an initial psychiatric evaluation, and a discharge report from December 2012. The intake assessment was completed by a social worker and summarized Plaintiff's explanation that I.M. threw frequent "temper tantrums, [was] not listening," was "physically

6

aggressive," had "difficulties sitting still," did not listen to her at home," "often screams and yells," "refuses to do homework," and could not concentrate. (A.R. at 362). It also noted that I.M.'s school had complained that she "often distracts and fights with other students and needs to be suspended from classrooms and buses" and that I.M. had been assigned to special education classes. (A.R. at 362, 373). The assessment also noted that Plaintiff had to leave for work at 4:45 a.m., placing responsibility to get I.M. to school on her 17-year-old sister, which resulted in both children's tardiness. (A.R. at 362). Finally, the assessment recorded I.M.'s statements that she "does not like herself, that she loses interest in activities, [and] has no friends." (A.R. at 362). Other descriptions, mostly sourced to Plaintiff's answers during the intake interview, include easy distractibility, rapid shifting from one activity to another, "starts fights," "temper tantrums," "active refusal to comply," "doesn't seem to listen," and "acts without listening." (A.R. at 367-78). The social worker concluded that alleviation of "ADHD symptoms" was the rationale for treatment and recommended outpatient treatment at JBFCS and a psychiatric evaluation. (A.R. at 381). The report listed ADHD medication as Concerta, although there is no indication which doctor prescribed it or when medication had changed from Adderall (A.R. at 374).

In a report summarizing the ensuing psychiatric evaluation dated May 9, 2011, an M.D. at JBFCS noted the same reported behavior and affects and made numerous other observations. Most notably, he noted that I.M. "did not have [as] much affect as mother described in her tantrums" (A.R. at 401), that he advised her to take I.M. to the emergency room or to call 911 when she grows violent (A.R. at 405), and that I.M. had reported auditory hallucinations involving a man's voice "telling to do her bad things for the past two years, usually at night." (A.R. at 401-02, 407). The report concludes that I.M. had "very limited functioning" and diagnosed her with "ADHD, combined type; O[ppositional] D[efiant] D[isorder]; L[earning] D[isability] NOS; [and a rule out diagnosis of] Psychotic Disorder, NOS." (A.R. at 407). It also discloses that the evaluating doctor prescribed her Vyvanse, yet another ADHD medication, and

7

referred her to therapy. (A.R. at 405-07). Over a year later the same doctor signed a New York

City Department of Education medical accommodation request form stating that she would

"benefit from a bus monitor on school-bus" in light of "failure to observe rules," need for frequent

"re-direction and assistance," restlessness, impulsiveness, and aggressiveness. (A.R. at 361).

In a "Disability Report" filed in July of 2011 (after the Commissioner denied her initial

application), Plaintiff indicated that the JBFCS had changed I.M.'s Vyvanse dosages, had

additionally prescribed Clonidine as nightly sleep medication, and that I.M. had begun "mental

therapy" at JBFCS. (A.R. at 288-92).

No other details of treatment through JBFCS appear in the record except her discharge

summary prepared by a social worker in December of 2012. (A.R. at 410-14). The report noted

"very minimal progress . . . due to mother not being consistent with bringing Client to therapy

and [appointments] with Dr. Change as well as not giving Client her medication." (A.R. at 410).

It further explained that I.M. infrequently received the prescribed Vyvanse and a subsequently

prescribed Risperdal (an anti-psychotic used to treat schizophrenia) as a result of:

> mother stating she leaves too early in the morning to give Client her
> medications. However mother has not followed through and complains
> that Client behavior is out of control and overwhelming. [The authoring
> social worker] has strongly encouraged that Client not being on
> medication is a factor that contributes to Client's behavior issues and lack
> of focus in school and in the home.

(A.R. at 410). The discharge report summarized the "presenting problem" as "CLIENT

THROWS TEMPER TANTRUMS, DOES NOT LISTEN TO DIRECTIVES, FIGHTS W/

SIBLINGS; IS PHYSICALLY AGGRESSIVE W/ OTHERS" (A.R. at 410 (capitals in original)), but

its "risk summary" nevertheless marked the risk of aggression as "minimal." (A.R. at 411). The

report also noted a Global Assessment Function ("GAF") score of 50 (A.R. at 413), which

indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent

shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no

friends)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental

Disorders, 4th ed. ("DSM-IV") at 32. The reason listed for I.M.'s discharge was that she would "be seeking treatment at Staten Island Mental Health (SIMH), closer to home in order to attend weekly counseling and be more consistent for therapy to be effective." (A.R. at 410).

In April 2011, just prior to I.M.'s "discharge" from treatment at the JBFCS, Dana Jackson, Psy.D, conducted the consultative psychiatric evaluation for the New York State Office of Temporary and Disability Assistance (the "NYS-TDA"). (A.R. at 321-25). Although Dr. Jackson's report mentioned past ADHD diagnoses, I.M.'s history of medications, and Plaintiff's complaints that I.M. was non-responsive to her medication, (A.R. at 322), her assessment was far milder than other evaluations. She described I.M. as "cooperative[,] answer[ing] questions willingly and openly." (A.R. at 322). She described I.M.'s tone and intensity of voice as "within normal limits." (A.R. at 322). I.M.'s thoughts were "unremarkable for psychotic processes," her mood and affect appeared to be within normal ranges, her intellectual skills deemed "average to high average," and her "attention and concentration were within normal limits" at this time. (A.R. at 323). Dr. Jackson concluded with only a rule out diagnosis for ADHD (combined type) and various learning disorders. (A.R. at 324).

Roughly one month later Dr. Belsky, M.D., another state agency psychological consultant, reviewed I.M.'s file and completed a Child Disability Evaluation Form and concluded that I.M.'s ADHD did not meet, medically equal, or functional equal the listing of impairments in Regulations, 20 C.F.R. pt. 404, subpt. P, app. 1. (A.R. at 226-32). In explaining his conclusion that I.M. was not limited in the domain of caring for oneself, Dr. Belsky noted a "mood disorder was alleged but she had full affect and congruent mood at the C[onsultative] E[valuation]." (A.R. at 330). In explaining his conclusion that I.M. was not limited in the domain of attending and completing tasks, Dr. Belsky briefly summarized answers from the February 2011 NYS-TDA teacher questionnaire form and added only: "At psych C[onsultative] E[valuation] she was attentive and cooperative." (A.R. at 339).

In January of 2013, I.M.'s medication was again changed to Risperdal at the Richmond University Medical Center in Staten Island. (A.R. at 360). She was directed to a follow up appointment at the Staten Island Mental Health site. (A.R. at 360).

Several months later I.M. received another IEP through the NYC DOE. (A.R. at 415-30). She was then twelve years old and in the sixth grade. The record relating to that IEP reflects that Sabrina Gordon, a school psychologist, advised that I.M. still needed a 12:1:1 OT class and counseling. (A.R. at 421-22). A teacher questionnaire form indicated that her reading, math, and written language levels were far below grade-appropriate levels. (A.R. at 423-31). It also stated that I.M. frequently missed class, "was late quite often," needs a "great amount of assistance" organizing thoughts, never completed homework assignments, had difficulty staying in her "space," and got frustrated easily and "shut down" when facing difficult work. (A.R. at 423-39). It also indicated that I.M. had a "very serious problem" comprehending oral instructions, focusing long enough to finish a task, refocusing, organizing things, completing assignments, and using good judgment regarding personal safety and dangerous circumstances. (A.R. at 425-29). She had "serious problem[s]" paying attention when spoken to directly, handling frustration, caring for physical needs, and being disruptive. (A.R. at 425-29). She also received marks for "slight" and "obvious" problems in numerous other areas. (*See* A.R. at 425-29).

## C. The March 28, 2013 Hearing

The ALJ held a hearing on March 28, 2013 with Plaintiff's counsel present. (A.R. at 106). In opening the hearing, the ALJ advised that he would hear testimony and then "make my decision based on that" testimony. (A.R. at 106). The ALJ briefly questioned both I.M. and Plaintiff. (A.R. at 108-112; 113-118). Counsel then questioned Plaintiff at slightly greater length. (A.R. at 118-27). Counsel did not question I.M.

In response to the ALJ's questions, I.M. said for fun she watched television or played Wii or other games with her friend, Heather. (A.R. at 109). She answered that she had more than

10

one friend but did not elaborate or describe social interactions beyond visiting Heather's house. (A.R. at 109-10). She also mentioned a "summer job" at which she helped her father deliver phone books. (A.R. at 110). She claimed to complete her homework assignments and to either walk or take the bus to school. (A.R. at 110-11). She mentioned taking medication at night and referenced a change in her medication made within the past several months. (A.R. at 111-12).

Plaintiff's testimony painted a bleaker picture. Plaintiff described difficulties spanning the previous five years and beginning around the "first or second grade," when the "problems really started." (A.R. at 114). She outlined difficulties getting I.M. to school in the morning and constant calls from school regarding truancy complaints, calls from frequent and gratuitous visits to the school nurse's office, I.M.'s obstinate refusal to take her medication, and her "chaotic . . . rages" that "destroy[ed]" her house. (A.R. at 114-17). Plaintiff stated that she had taken I.M. to the emergency room in the midst of three of these "rages," but that she was not admitted because "they didn't have any beds." (A.R. at 115-16). She stated that her older daughter and a "girl" she had hired attempted to assist I.M. with morning preparations and getting to school on time, but that both refused to assist after persistent abuse and insult from I.M. (A.R. at 115). She further described that I.M. on occasion wandered off or took the bus home without permission or assistance and sometimes threw family belongings out the window or in the bathtub. (A.R. at 118-20; 122-24). Plaintiff also stated that I.M. had only one friend and that the friendship began several weeks prior. (A.R. at 120). She also described that I.M. was having social difficulty and faced bullying at school. (A.R. at 120-21). For example, she claimed that students took and "spit all over" her coat and "threw all her books out." (A.R. at 121). Separately, she said that I.M. "doesn't sleep at night. She gets up screaming, crying. This has been an ongoing thing." (A.R. at 124). Nevertheless, Plaintiff stated that, despite these troubles, she did not believe I.M. was a danger to herself. (A.R. at 122).

Regarding medical and psychiatric treatment, Plaintiff stated that I.M. was currently prescribed Risperdal and Vyvanse. (A.R. at 114). When the ALJ asked how frequently I.M.

11

failed/refused to take her medicine, Plaintiff described ongoing difficulties and inconsistent medication. She responded "it's . . . on and off. One day she'll take it the next minute, 'I'm not taking it.' " (A.R. at 115). Plaintiff asserted that the medication was "not working because she's not taking it constantly." (A.R. at 115). In response, the ALJ asked whether I.M.'s medication was effective when taken:

> Q. And when she takes the medication is it effective?"
> A. Yes. It calms her down.
> Q. And how long has she been giving a problem with taking the
> medicine in the morning.
> A. Years. This has been going on for years.

(A.R. at 115). Plaintiff's counsel made a brief closing statement acknowledging the "problem with the mechanics of the family . . . in terms of getting [I.M.] up, getting dressed, getting to school, [and] taking her medication." (A.R. at 127). In light of those problems, counsel argued, I.M. must be viewed as functionally limited in the domain of attending and completing tasks, acquiring and using information, and caring for oneself. (A.R. at 127-28).

### D. The ALJ's Decision

The ALJ disagreed and on April 5, 2013, issued his decision denying Plaintiff's application for SSI on behalf of I.M. (A.R. at 83-99). The ALJ ruled that while Plaintiff's ADHD was a severe impairment under 20 CFR 416.909, it did not meet or functionally equal the impairments listed in 20 CFR Part 404. (A.R. at 88-89). As explained below, this determination rested entirely on a finding that statements regarding "the intensity, persistence and limiting effects of [I.M.'s] symptoms [were] not entirely credible." (A.R. at 93). Regarding I.M.'s functional equivalence in the domain of "attending and completing tasks," the ALJ found a less than marked limitation. Regarding her functional ability to care for herself, the ALJ found a less than marked limitation after characterizing her school records as indicating only "some difficulties in handling frustration appropriately, using appropriate coping skills, and using good

12

judgment regarding personal safely [sic] and danger" (A.R. at 98). The ALJ summarized all other "statements" in the record as regarding only "moderate, intermittent difficulties" in this domain. (A.R. at 98).

E.    New Evidence and Appeals Council Decision

In November of 2013, roughly seven months after the ALJ's decision and while Plaintiff's appeal to the Appeals Council remained pending, I.M. told her school counselor that she intended to kill herself by jumping in front of a car and was promptly committed to South Beach Psychiatric Center. (A.R. at 26). She remained there and received inpatient care for over six months. On June 25, 2014, Plaintiff sent the Appeals Council the psychiatric records from I.M.'s inpatient treatment as additional evidence in support of her claim. (A.R. at 2, 8-74, 304). Those records included a discharge summary, screening reports, treatment reports, and other detailed assessments not previously in the record. (A.R. at 7-74).

On September 10, 2014, the Appeals Council denied Plaintiff's request for review. (A.R. at 1-7). Regarding the psychiatric records submitted in June, the council stated that it had "looked at records from South Beach Psychiatric Center from November 2013 to May 2014. The Administrative Law Judge decided your case through April 5, 2013. This new information is about a later time. Therefore it does not affect the decision about whether you were disabled beginning on or before April 4, 2013." (A.R. at 1-2). Plaintiff then initiated this suit on November 5, 2014 seeking judicial review of the Commissioner's decision "and judgment for such relief as may be proper." (ECF. No. 1 at 3).

II. LEGAL STANDARDS

A. Standard of Review

Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), permits "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . [to] obtain a review of such decision by a civil action

commenced within sixty days after the mailing to him of notice of such decision . . . in the district court of the United States for the judicial district in which the plaintiff resides." Under the fourth sentence of section 405(g), the reviewing district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Under the sixth sentence, "The court may ... remand the case to the Commissioner for further action by the Commissioner and it may at any time order additional evidence to be taken before the Commissioner . . ."

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to two levels of inquiry. A court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination" and secondarily "whether the determination is supported by 'substantial evidence.' " *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). When reviewing the factual record, it is not this Court's role "to resolve evidentiary conflicts . . . [nor] to appraise the credibility of witnesses, including the claimant;" instead, those are judgments for the Commissioner to make. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983) (citations omitted). Courts give great deference to an ALJ's credibility determination because the ALJ had the opportunity to observe the plaintiff's demeanor while testifying. *Ruiz v. Barnhart*, 2006 WL 1273832, at *7 (S.D.N.Y. May 10, 2006); *Gemavage v. Shalala*, 882 F.Supp. 1413, 1419 n. 6 (S.D.N.Y. Apr. 24, 1995). However, the "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Accordingly, an ALJ's failure to apply correct legal standards is grounds for reversal. *Id.* (citing *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. On the other hand, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

B. SSA Childhood Disability Determinations

The Social Security Act provides benefits for disabled children as well adults. *Encarnacion v. Astrue*, 568 F.3d 72, 74 (2d Cir.2009). Children from low-income families may receive SSI benefits under Title XVI of the Social Security Act if the child's income and assets do not exceed a certain amount and if the child is "disabled" under the Act. 42 U.S.C. § 1382(a)(1). A child is disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." § 1382c(a)(3)(C)(i).

To determine a child's eligibility for SSI benefits, the SSA applies a three-step sequential analysis set forth in the Commissioner's regulations at 20 C.F.R. §§ 416.924 to 416.926a. *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir.2004). First, the SSA determines whether the child is engaged in "substantial gainful employment." § 416.924(b). If the child is not engaged in such employment, the SSA then decides whether the child has a "medically determinable impairment[ ] that is severe." § 416.924(c). Lastly, if the child has a severe impairment, the SSA evaluates whether the impairment meets, medically equals, or functionally equals an impairment listed in the Regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 ("the Listings"). 20 C.F.R. § 416.924(d). If the child's impairment does not meet an impairment found in the Listings or the medical equivalent thereof, then the SSA considers the effect of the child's impairment in

15

six broad "domains" of functioning. § 416.926a. These domains include (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. § 416.926a(b)(l). A child's impairment is considered functionally equivalent to the Listings if the SSA finds that the child has an extreme limitation in one of these domains or a marked limitation in two of these domains. § 416.926a(a). A marked limitation is one which seriously interferes with the child's ability to independently initiate, sustain, or complete activities. § 416.926a(e). It is "more than moderate but "less than extreme." *Id.* An extreme limitation is one which very seriously interferes with the child's ability. *Id.*

### C. The Required Procedure

Before an ALJ can perform the above analysis, however, the ALJ must sufficiently develop the record. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). Thus, before deciding if the Commissioner's determination is supported by substantial evidence, courts must first be satisfied that the claimant received "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir.1982) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir.1972)). Indeed, an "ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Echevarria*, 685 F.2d at 755. Relatedly, an "ALJ's finding that a witness lacks credibility must be 'set forth with sufficient specificity to permit intelligible plenary review of the record.'" *Morrison v. Astrue*, 08-cv-2048, 2010 U.S. Dist. LEXIS 115190, at *12 (E.D.N.Y. Oct. 27, 2010) (quoting *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988)). Thus, "[t]he failure to make credibility findings regarding . . . critical testimony fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support his conclusion that claimant is not under a

16

disability." *Williams*, 859 F.2d at 260-61 (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.1984)).

To this end, "the reviewing court must make a 'searching investigation' of the record to ensure that" the ALJ protected the claimant's rights. *Robinson v. Sec'y of Health & Human Servs.*, 733 F.2d 255, 258 (2d Cir.1984) (citation omitted). "If the reviewing court determines that a claimant did not receive a 'fair and adequate hearing' before the ALJ . . . it must remand the case to the Commissioner even if the Commissioner's decision was supported by substantial evidence." *Watson v. Astrue*, 2009 WL 6371622, at * 5 (S.D.N.Y Feb. 4, 2009) (citations and quotation marks omitted).


## IV. ANALYSIS

Plaintiff moves for judgment on the pleadings, contending that I.M. is "unquestionably disabled" because her various diagnoses and the surrounding evidence unequivocally demonstrate that she meets the functional equivalence standard in "at least two domains," namely "attending and completing tasks" and "caring for yourself."[1] (ECF 15 at 16-17). She argues that the Appeals Council erroneously refused to consider records from the South Beach Psychiatric Center, and that the administrative record—with or without those documents—compels a finding that she is disabled. (*Id.*) She also argues that the ALJ legally erred by denying her SSI application based on failure to follow prescribed treatment in violation of 20 C.F.R. § 416.930 and Social Security Ruling ("SSR") 82-59. (ECF No. 15 at 21-23). On these grounds Plaintiff urges the Court to reverse the ALJ and award benefits without remanding for

---

[1] Plaintiff also summarily asserts without discussion that I.M. meets the listing for ADHD in Listing 112.11. (ECF No. 15 at 16-17). She likewise states in passing that "I.M. very likely has marked limitations in other domains as well, i.e., 'acquiring and using information' and 'interacting and relating with others.' " (*Id.*). Nevertheless, the only domains substantively addressed in her briefs are "attending and completing tasks" and "caring for yourself." Because the court finds several grounds for reversal in light of issues relating to those two domains, (ECF. No. 15 at 17), and in light of Plaintiff's assertion that analysis under Listing 112.11 are the same as that under for determining functional equivalence, the court does not address these passing assertions.

further agency proceedings to further the general purpose of the SSI children's program and to prevent further delay. (ECF. No. 15 at 24-25).

The Commissioner cross moves, contending that the ALJ's decision was supported by substantial evidence. (ECF No. 19). Regarding the records from I.M.'s 2013 inpatient stay at the South Beach Psychiatric Center, the Commissioner argues that the Appeals Council properly disregarded those records because they concerned events and diagnoses that post-date the relevant time period. (ECF. No. 20 at 3-4). Regarding Plaintiff's argument that the ALJ impermissibly considered I.M.'s failure to follow prescribed treatment, the Commissioner responds that 20 C.F.R. § 416.930 is inapplicable in the absence of a finding of disability and that the ALJ properly considered I.M.'s failure to follow prescribed treatment under 20 C.F.R §§ 416.913(b)(5), 416.924a(b)(9), and 416.926(l)(2). (ECF No. 20 at 6-7).

After careful review of the record and the parties' submissions, the Court concludes that ALJ committed two legal errors requiring remand. First, he premised his determination of I.M.'s functional equivalence on a conclusory credibility finding. Second, he considering I.M.'s failure to follow prescribed treatment in violation of SSA regulations and rulings. Additionally, as the reasoning in *Pollard v. Halter*, 377 F.3d 183 (2d Cir. 2004) clearly demonstrates, the Appeals Council erred when refusing to consider evidence of I.M.'s committal several months after the ALJ's decision. For each of these reasons the court concludes that the case must be remanded for further proceedings.


A. The ALJ's Functional Equivalence Determinations Were Premised on an Insufficient Credibility Determination

In addressing whether I.M.'s ADHD functionally equaled the Listings, the ALJ found that the evidence established that I.M. had a severe impairment but it did not show a "marked" or "extreme" limitation in any of the six domains of activities enumerated in § 416.926a(b)(l).

(A.R. at 93). He premised this ruling, *in toto* and without qualification, on his determination that:

> the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained below. Specifically, there is no evidence in the record that [I.M.'s] ADHD is causing serious limitations in her physical activities, her ability to interact with her friends, or ability to care for herself.

(A.R. at 93). Although the ALJ thereby expressly premised his finding concerning I.M.'s limitations on a credibility determination and purported to offer "reasons explained below," the remainder of his decision made no reference to a lack of credibility, bases for such a finding or an explanation of whose credibility he deemed lacking.

Rather, the only credibility determinations addressed in the remainder of the decision involved "opinion evidence" provided by (i) Dr. Jackson, the consultative examiner, whom the ALJ afforded "great weight;" (ii) Dr. Belsky, the state agency psychological consultant also afforded "great weight;" (iii) I.M.'s teachers and IEPs, which were afforded "some weight;" (iv) and Ms. Tiboni, whom the ALJ also afforded "some weight." (A.R. at 93). There is no mention of the credibility of Plaintiff's hearing testimony or her accounts of I.M.'s behavior as they appeared in her SSI application (A.R. at 261-73) or the JBFCS intake report and evaluations (A.R. at 362-414).

With respect to the two domains at issue on this appeal, "attending and completing tasks" and "caring for yourself," the ALJ's analyses each constitute only a single paragraph. (*See* A.R. at 95, 97). Regarding the former, the ALJ's analysis states only that:

> [I.M.'s] teachers reported that she needed frequent refocusing, never completed homework or classwork, was frequently unprepared and unorganized, and distracted other students by singing and making noises. [Plaintiff] has also reported that she had trouble sitting still, and could not concentrate or follow her teachers during class. Additionally, during a re-evaluation at the [JBFCS], the claimant was noted to be inattentive during the interview with impaired concentration. However, during the April 2011 consultative examination the claimant's recent and remote memory skills were good and her attention and concentration

19

were within normal limits. The consultative examiner also opined that the claimant was able to maintain a regular schedule and perform complex tasks independently. In the claimant's disrchage [sic] summary, the [JBFCS] social worker indicated that treatment had not been effective due to a failure to attend regular therapy and medication management appointment [sic], and failure to administer prescribed medication on a consistent basis. The social worker attempted to work around scheduling problems and have the claimant's medication administered in school to ensure regular compliance, however, her mother failed to follow through with this option. The social worker informed the claimant's mother that inconsistent medication was a factor that contributed to [I.M.'s] behavior issues and lack of focus at school and at home. The claimant's mother testified that when she takes it, the medication helps to keep the claimant calm and improves her behavior. Based on this information regarding [I.M.'s] difficulties and the lack of compliance with prescribed treatment, I find that [I.M.] has less than marked limitations in this domain."

(A.R. at 95). Regarding the domain of "caring for yourself," the ALJ's analysis, in its entirety, was:

> [I.M.'s] former teachers reported that she has some difficulties handling frustration appropriately, using appropriate coping skills, and using good judgment regarding personal safely [sic] and danger. [I.M.'s] mother testified that she frequently wonders [sic] off on her own when they leave the house and sometimes fails to shower or brush her teeth prior to leaving for school. [I.M.] reported that she has some trouble falling asleep at night, though she also indicated that her medication has helped her sleep better. Based on these statements regarding her moderate, intermittent difficulties in these areas, I find that the claimant has less than marked limitations in this domain.

(A.R. at 98). Again, neither of these cursory analyses disclose the credibility determination on which the ALJ categorically premised his ruling, let alone which witness's credibility the ALJ found lacking. Nor does the remainder of the ALJ's opinion, which makes no further mention of credibility.

The complete absence of findings regarding the "credibility" on which the severity of I.M.'s symptoms depended constitutes legal error. Credibility determinations must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams*, 859 F.2d at 260-61 (citing *Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir.1983).

20

Here, the credibility determination on which the ALJ's entire ruling depends remains conclusory and anonymous as to source. No meaningful review of this crucial credibility determination is possible on this record.

B. The ALJ Impermissibly Considered I.M.'s Failure to Follow Treatment in Determining Her Limitations in the Domain of "Attending and Completing Tasks"

The ALJ also erred in basing his finding that I.M. had no marked or extreme limitations in the domain of "attending and completing tasks" on her failure to follow prescribed medical treatment. (A.R. at 95). As noted above, he analyzed I.M.'s limitations in that domain in a single, short paragraph. It briefly mentions (i) evidence that I.M. never completed homework and had problems with concentration, organization, and attentiveness, (ii) the consultative examiner's opinion that she had good memory skills and was able to maintain a regular schedule and perform complex tasks, (iii) the JBFCS discharge summary's statements that I.M.'s treatment was ineffective "due to a failure to attend regular therapy and medication management appointment[s], and failure to administer prescribed medication on a consistent basis," and (iv) Plaintiff's testimony that when I.M. takes her medication, "it helps to keep the claimant calm and improves her behavior." (A.R. at 95). "Based on this information regarding [I.M.'s] difficulties and the lack of compliance with prescribed treatment, [the ALJ found] that [I.M.] has less than marked limitations in this domain." (A.R. at 95).

Under SSA regulations, the Commissioner may deny SSI benefits for failure to follow medically prescribed treatment only after following appropriate procedures and making requisite findings as set forth in 20 C.F.R. section 416.930 and further enunciated in SSR 82-59. Specifically, the Commissioner "may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:"

> 1. The evidence establishes that the individual's impairment [meets the relevant standard for determining disability] [2]

---

[2]As the parties agree, the relevant standard here is whether I.M.'s impairment prevents her from functioning in an age appropriate manner as set forth in 20 C.F.R. sections 416.924 and 416.924a. (*See* ECF Nos. 15 at 18, 20 at 21);

2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

3. Treatment which is clearly expected to restore capacity [function at an age appropriate level] has been prescribed by a treating source; and

4. The evidence of record discloses that there has been refusal to follow prescribed treatment. <u>Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable</u>.

(SSR 82-59, 1982 WL 31384 at *1) (emphasis added); *see also* 20 C.F.R. § 404.1530 (stating that claimants may refuse treatment for a "good reason."). Thus, where failure to follow treatment is a basis for finding that a claimant is not disabled, "appropriate development [of the record] must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed." *Id.* at *2; *see also Taylor v. Callahan*, 969 F. Supp. 664, 671 (D. Kan. 1997) (where SSA "makes a determination of 'failure,' a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable."). Moreover, "before a determination [of failure] is made, the individual, or . . . the person acting on their behalf, will be informed of this fact and of its effect on eligibility for benefits." 1982 WL 31384 at *5. To that end, an ALJ has a duty to make claimants "aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits." *Id.* at *2.

Here, several of these procedural requirements were not met. Most notably, there is no indication that the ALJ advised Plaintiff that "continued failure to follow prescribed treatment

_____

*see also Robinson v. Chater*, No. 94 CIV. 8430 (DLC), 1996 WL 345899, at *5 (S.D.N.Y. June 21, 1996) )("In the case of children, for whom functionality in an age-appropriate manner is the touchstone, [C.F.R. section 416.930] would apply to children who are unable to function in an age-appropriate manner, but who would be able to so function if properly medicated.")

without good reason [could] result in denial . . . of benefits." *Id.*; *see also Grubb v. Apfel*, No. 98 CIV. 9032 (RPP), 2003 WL 23009266, at *5 (S.D.N.Y. Dec. 22, 2003) ("As a procedural matter, if the commissioner fails to provide the claimant with an opportunity to address the issue, he loses the ability to assert it as a reason for denying disability benefits.") Nor did he discuss or make findings regarding whether I.M. justifiably or with good reason refused treatment. For both reasons the case must be remanded for further proceedings.

In arguing the contrary, the Commissioner contends that the ALJ properly "employed a full analysis for child's [sic] disability claims [as] set forth in 20 C.F.R. §§ 416.924 through 416.926a" and that consideration of I.M.'s failure to follow treatment was properly considered under sections 416.913(b)(5), 416.924a[3], 416.926a. (Reply Br., ECF No. 20, at 7). She also asserts that procedural protections set forth in SSR 82-59 are "irrelevant" because they only apply "to an individual who would otherwise be found to be under disability." (*Id.*)

This argument misconstrues both the ALJ's decision and the reach of SSR 82-59. While, as some courts have noted, "SSR 82–59 normally applies to a claimant's eligibility for benefits after a finding of disability has been made," if a finding of non-disability is clearly premised on a failure to follow treatment then the procedural safeguards of section 416.930 and SSR 82-59 must be followed. *Grubb v. Apfel*, No. 98 CIV. 9032 (RPP), 2003 WL 23009266, at *5 (S.D.N.Y. Dec. 22, 2003). Those procedural safeguards apply even where failure to follow prescribed treatment was not an explicit grounds for denying benefits. Indeed, "where an ALJ did not expressly deny claimant benefits on the grounds that she failed to follow prescribed treatment," courts have nevertheless "inferred from the ALJ's reasoning that the ALJ based a finding of disability on the lack of compliance" and remanded for further proceedings consistent with SSR 82-59. *See id.* at *6 (collecting cases); *accord McFadden v. Barnhart*, No. 94 CIV.

---

[3] In an apparent typographical error, the Commissioner cites to section 416.926 for the proposition that "medications are to be considered in evaluating the domain of health and physical well-being." (Reply Br. at 7).

8734(RPP), 2003 WL 1483444, at *8 (S.D.N.Y. Mar. 21, 2003) (remanding where the ALJ "committed legal error by not following the mandates of SSR 82-59.")

Here, the ALJ's determination that I.M. was not functionally limited in this domain (and therefore not "disabled) was explicitly "[b]ased on . . . information regarding [I.M.'s] . . . lack of compliance with prescribed treatment." (A.R. at 95). The procedural requirements set forth in SSR 82-59 therefore must apply. The Commissioner's appeal to sections 416.913(b)(5), 416.924a, 416.926a are unavailing. Section 416.913 merely sets forth in general terms what sources of evidence are properly considered when evaluating impairments and, at subsection (b)(5), lists "[t]reatment prescribed with response" as a proper component of "medical reports." Likewise, section 416.924a states in general terms only that the Commissioner will "evaluate" the "effects of treatment" to determine functional equivalence, and says nothing concerning the procedure for such evaluations. Section 416.926a(l)(2) merely states that "the medications you take (e.g., for asthma or depression) or the treatments you receive (e.g., chemotherapy or multiple surgeries) may have physical effects that also limit your" functioning in the domain of "health and physical well-being." None of these regulations contradict, alter, or even reference the procedures required under section 416.930 and SSR 82-59[4].

In sum, the ALJ erred by basing his determination that I.M.'s ADHD had no marked limitations on her ability to attend and complete tasks on her failure to follow medical treatment without adhering to section 416.930 and SSR 82-59.

---

[4] Otherwise, courts have only considered failure to follow prescribed treatment as a credibility issue for reasons irrelevant here. *See, e.g., Lasalle v. Colvin*, No. 14-CV-872-JTC, 2016 WL 420589, at *6 (W.D.N.Y. Feb. 4, 2016) ("However, the ALJ was permitted to consider plaintiff's noncompliance with treatment as a factor weighing against her credibility"); *Palmer v. Astrue*, No. 1:10-CV-151-JGM, 2011 WL 3881024, at *5 (D. Vt. Sept. 2, 2011) (claimant's failure to seek treatment for anxiety or insomnia undermined her credibility regarding intensity and limitations.); *Jackson v. Barnhart*, 2008 WL 1848624, *11 (W.D.N.Y. April 23, 2008) (failure to follow a recommended course of treatment weighs against a claimant's credibility). As explained above in section IV.A, any credibility determination here that could be based on failure to follow treatment lacked any explanation or supporting findings.

C. The Appeals Council Erred In Refusing to Consider Records from the SBPC.

Under 42 U.S.C. section 405(g), the Court "may at any time" remand and "order additional evidence to be taken before the [Commissioner], but only upon a showing that there is *new* evidence which is *material* and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (emphasis added); *see also* 20 C.F.R. §§ 404.970, 416.1570(b); *Perez v. Chater*, 77 F.3d 41, 44–46 (2d Cir.1996). New and material evidence submitted after an ALJ's decision "shall" be considered "only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); *Bailey v. Astrue*, 815 F. Supp. 2d 590, 600 (E.D.N.Y. 2011) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626, (1990).

Three requirements must be met for a Court to remand a case and order consideration of additional evidence: (1) the evidence must be new, (2) it must be material, and (3) there must be good cause for failure to present the evidence in earlier proceedings. *See Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988); *Houston v. Colvin*, No. 12-CV-03842 NGG, 2014 WL 4416679, at *8 (E.D.N.Y. Sept. 8, 2014). Evidence is "new" when it is "not merely cumulative of what is already in the record." *Tirado*, 842 F.2d at 597 (2d Cir. 1988). To be material, evidence "must be both (1) relevant to the claimant's condition during the time period for which benefits were denied" and (2) "probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently." *Pollard*, 377 F.3d at 193 (citations and quotation marks omitted).

Here, the evidence submitted to and rejected by the Appeals Council involves I.M.'s inpatient hospitalization at the South Beach Psychiatric Center (the "SBPC") in Staten Island, where she was committed for over six months to an inpatient stay after disclosing her plans to commit suicide to her school counselor. It is comprised of a discharge summary, screening reports, treatment reports, and other detailed assessments. (A.R. at 7-74). It discloses that I.M.

weighed 186 pounds when admitted on July 23, 2013, and weighed 227 pounds when
discharged on May 15, 2014. (A.R. at 21). By that time she was suspected to suffer from onset
type II diabetes, but refused to take glucose tolerance tests needed to confirm a diagnosis.
(A.R. at 21). Upon admission, she complained about her own "anger and coping skills." (A.R. at
26). An intake report noted her complaints of "being [the] target of physical bullying," of
"incidents of her belongings be[ing] thrown in [a] garbage can," and of being spit on at school.
(A.R. at 26). It also noted Plaintiff's concern that I.M.'s rages had recently escalated to
"physically hurting her maternal grandmother," (A.R. at 26), and I.M.'s admission that "she has
cut herself with a knife and scratched her arms with her fingernails," (A.R. at 50, 67). As part of
a "trauma assessment," the SPBC records indicate that I.M. "hurt [her] sister in response to
phys[ical] aggression." (A.R. at 65). The intake report also noted that I.M. had been depressed
for the prior 9 months. (A.R. at 36).

     A December 20, 2013 SBPC Psychological Assessment report noted that while I.M. was
at times "cheerful, talkative, and engaged," she swung to "agitated, oppositional and refus[ing]
to talk." (A.R. at 67). It described her "low frustration tolerance" and how, after a few minutes of
cognitive testing, she "refused to continue and stopped talking with the examiner" and began
communicating only by "a series of hand signals and by writing on the table with her finger."
(A.R. at 67-68). She exhibited the same behavior during later tests and also "scratched at the
desk and laid on the floor" instead of completing requested tasks. (A.R. at 68, 71). When she
cooperated, she demonstrated that she can at times "sustain attention, concentrate, perform
mental operations in her head, and keep information in her working memory," but "in
overwhelming or complex situations her thoughts might become illogical or incoherent and she
might have difficulties with reality testing." (A.R. at 72-73).

     These records are undoubtedly new and not merely cumulative of evidence in the
record. They include detailed third-party assessments not previously available to the ALJ that
corroborate Plaintiff's accounts of I.M.'s behavior (which the ALJ implicitly rejected) and offer a

detailed progression of I.M.'s condition. Moreover, good cause exists for Plaintiff's failure to submit the SBPC records to the ALJ because they did not exist on the date of the hearing. *Pollard*, 377 F.3d at 193. ("Because the [psychiatric reports] submitted by [plaintiff] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for her failure to submit this evidence to the ALJ.")

These records are also material. As the Second Circuit explained in *Pollard*, a case with unusually similar facts, new evidence is material if it is "(1) relevant to the claimant's condition during the time period for which benefits were denied" and (2) shows "a reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently." *Id.* There, as here, the court considered records from a child's psychiatric hospitalization that occurred after the ALJ denied SSI benefits but before district court review. *Id.* at 187-88. The Second Circuit held that the new records were relevant to the time period at issue even though they were generated after the ALJ's decision. That is, because those records directly supported the claimant's mother's contentions and "strongly suggest[ed] that, during the relevant time period, [the claimant's] condition was far more serious than previously thought and that additional impairments existed when [he] was younger."[5] *Id.* at 193. The court also considered the same evidence probative and likely to affect the ALJ's consideration because it weighed towards a finding of marked and extreme limitations in several domains, including "caring for oneself." *Id.* at 193-94.

For much the same reasons, the SBPC records are relevant and probative here. They are relevant to the time period considered by the ALJ because, as in *Pollard*, they support Plaintiff's descriptions of I.M. raging when frustrated or displeased. Indeed, I.M. herself complained during her admission to SBPC of her "anger and coping skills." Moreover, the new

---

[5] The relevant time period runs from the date of the alleged disability to the date of the ALJ's decision. *Evans v. Colvin*, No. 15-2569-CV, 2016 WL 2909358, at *1 (2d Cir. May 19, 2016); *Mitchell v. Colvin*, No. 14 CV 04154, 2015 WL 5306208, at *9 (S.D.N.Y. Sept. 10, 2015).

records also suggest that her rages grew worse and resulted in harm to her grandmother, herself, and her sister. They also detail a continuation of the same issues addressed in Plaintiff's testimony and in IEPs, including a severe lack of focus, disruptive classroom behavior, and problems with impulse. These records are also probative and create at least a "reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently" with respect to numerous domains. *Pollard*, 377 F.3d at 193. Among other things, they suggest that I.M. had an extreme limitation in the domains of "caring for yourself" and ""attending and completing tasks." The Commissioner must determine limitations in the former by considering how well a child can "maintain a healthy emotional and physical state, including how [one] cope[s] with stress and changes in . . . environment." 20 C.F.R. § 416.926a(k). The latter must be determined with reference to a child's ability "to focus and maintain . . . attention" and "begin, carry through, and finish activities." *Id.* at § 416.926a(h). Here, the ALJ considered ample evidence suggestive of marked and severe limitations in both domains:

- The teacher report in I.M.'s 2010 IEP stated that she "calls out and gets out of her seat through the day," that "she gets angry easily if she does not want to do what the teacher asks her to do . . . [and] is never prepared for school and is very disorganized." (A.R. at 231).

- The IEP also documented "great . . . difficulty controlling her impulses,"(A.R. at 233), "an enormous amount of underlying anger and aggression"

- Plaintiff's statements summarized in the JBFCS intake assessment indicated that I.M. threw frequent "temper tantrums," was "physically aggressive," had "difficulties sitting still," did not listen to her at home," "often screams and yells," "refuses to do homework," and could not concentrate. (A.R. at 362).

- The same report recorded I.M.'s statements that she "does not like herself, that she loses interest in activities, [and] has no friends." (A.R. at 362).

- A JBFCS doctor later requested that she receive a bus monitor in light of her need for frequent "re-direction and assistance," restlessness, impulsiveness, and aggressiveness. (A.R. at 361).

- I.M.'s 2013 IEP stated that I.M. needed "great amount of assistance" organizing thoughts, never completed homework assignments, had difficulty staying in her "space," and got frustrated easily and "shut down" when facing difficult work. (A.R. at 423-39). It also indicated that I.M. had "a very serious problem[s]" comprehending oral instructions, focusing long enough to finish a task, refocusing, organizing things, completing assignments, and using good judgment regarding personal safety and dangerous circumstances. (A.R. 425-29).

- While testifying before the ALJ Plaintiff claimed I.M.'s rages "destroyed" her house and she exhibited other destructive behavior that at times led to emergency room visits. (A.R. at 114-17).

As noted above in section V.A, in addressing whether I.M. had limitations in either domain, the ALJ found that this evidence "lacked credibility" when evaluated as proof of the "limiting effects" of I.M.'s impairment. (A.R. at 93). Considering that the SBPC records corroborate and expand on the same issues, it is a reasonable possibility—indeed, it is likely—that the ALJ will reevaluate that finding when these new records are considered.

The Commissioner summarily asserts that these records "do not contain any new information about I.M.'s condition during" the same period and emphasizes that they reflect I.M.'s first psychiatric admission, suicidal ideation, and major depressive disorder diagnosis. (Reply Br. at 3-4). However, as explained above, the SBPC records need not contain "new information" to be probative, since the ALJ's determination was premised on "credibility." That

I.M. had not previously expressed suicidal ideation or received a diagnosis of major depressive disorder is for the same reason beside the point. The present facts are not meaningfully distinguishable from those in *Pollard*, which is perhaps why the Commissioner makes no mention of the case in responding to Plaintiff's arguments.

In sum, and as in *Pollard*, the ALJ premised his findings on credibility determinations. The new evidence submitted to the Appeals Council directly relates to each domain at issue on this appeal and, if "analyzed in conjunction with the administrative record, creates at minimum a reasonable possibility" the ALJ will reevaluate those determinations on remand. *Pollard*, 377 F.3d at 194.

## D. DISPOSITION

Plaintiff invites the Court to award benefits without remanding for further proceedings, contending that "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose" and in fact defeat the purpose of the "children's SSI program, which is to enable low-income families to afford special education, medical treatment, physical rehabilitation, early intervention services, and personal needs assistance for the child." (ECF No. 15 at 24) (citations omitted). However, as the Commissioner points out, the record is devoid of findings regarding other requirements for SSI benefits including the resource and income limits. Moreover, where the Appeals Council fails to properly consider new and material evidence, as is the case here, the appropriate "course for the reviewing court is to remand the case for reconsideration in light of the new evidence." *Shields v. Astrue*, No. 11-CV-2088 FB, 2012 WL 1865505, at *2 (E.D.N.Y. May 22, 2012); *see also Ingram v. Comm'r of Social Sec.*, 496 F.3d 1253, 1269 (11th Cir.2007) ("Because evidence properly presented to the Appeals Council has been considered by the Commissioner and is part of the administrative record, that evidence can be the basis for only a sentence four remand, not a sentence six remand."); *see generally Perez v. Chater*, 77 F.3d 41, 45 (2d

Cir.1996) (holding that "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision") Additionally, "[r]emand is particularly appropriate where, as here, we are 'unable to fathom the ALJ's rationale in relation to the evidence in the record' without 'further findings or clearer explanation for the decision.' " *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.1996) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982)).

## V. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is **DENIED**, and Plaintiff's motion is **GRANTED** in **PART**. The case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk of Court is directed to enter judgment and close the case.

_/s/ *Sandra L. Townes*_
SANDRA L. TOWNES
United States District Judge

Dated: December 20, 2016
Brooklyn, New York